| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br>*Caption in Compliance with D.N.J. LBR 9004-1(b)*<br>**JON ZIEFERT, ESQ.**<br>3 New York Ave., #415<br>Jersey City, NJ 07307<br>Telephone: (917) 757-5481<br>Email: jonziefert@gmail.com<br><br>**KEN ROSEN ADVISORS P.C.**<br>Kenneth A. Rosen, Esq.<br>80 Central Park West, #3B<br>New York, NY 10023<br>Telephone: (973) 493-4955<br>Email: ken@kenrosenadvisors.com<br><br>Proposed Counsel to the Debtor and<br>Debtor in Possession | |
| In re:<br><br>BLUE APPLE BOOKS, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 25-11469 |

## DECLARATION OF HARRIET ZIEFERT IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Harriet Ziefert, make this declaration (this "Declaration") under 28 U.S.C. §1746.

1. I am President of Blue Apple Books, LLC, a New Jersey limited liability company ("Debtor"), a children's book publishing company.

2. I am an editor. I am also author and copyright holder of books for numerous publishers, including Debtor.

3. Harriet Ziefert, Inc. (HZI) own 88% of the membership interests in Debtor and Pomum Liber, LLC, a New Jersey limited liability company ("Pomum Liber"), owns 12% of the membership interests in Debtor.

4. On information and belief, Pomum Liber is owned 50% by Alberto Fernandez

1

("Fernandez") and 50% by the Estate of John Kellenyi ("Kellenyi").

5. I am familiar with the day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of the Debtor's Chapter 11 case.

6. I have more than 40 years of experience in the children's book publishing industry. I earned a BA degree from Smith College and an MA Degree in Education from New York University. I was an elementary school teacher before starting Debtor. As an author, I have written over 350 children's book titles. I developed Early Reading Programs for more than 100 "easy-to-read" titles. The titles are part of leveled programs published by Random House, Viking Penguin, Harper Collins, and Sterling Publishing. The titles earn revenue from series entitled "I'm Going to Read" (Sterling Publishing), "Step-into-Reading" (Random House) and "Hello Reading" (Penguin).

7. On February 11, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of New Jersey, Newark Vicinage (the "Court"). The Debtor continues to operate its business and manage its assets and collect revenue as Debtor in Possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8. Debtor seeks to continue to use cash receivables to preserve its valuable relationships with suppliers, vendors, customers, authors and illustrators. Debtor wishes to maintain employee and author/illustrator morale; Debtor wishes to keep the trust and confidence of authors and illustrators. And Debtor will implement administrative procedures that will promote a seamless transition into Chapter 11.

9. To enable the Debtor to operate effectively, maximize the benefits of the reorganization process and minimize potential adverse effects in the Chapter 11 Case, the Debtor

2

has requested certain relief in "first day" motions and applications (collectively, the "First Day Motions"), filed with the Court concurrently herewith.

10. The First Day Motions, summarized below, seek, among other things, to (a) ensure the continuity of the Debtor's business operations without interruption, (b) preserve the Debtor's valuable relationships with authors, illustrators, printers, and digital distributors, (c) maintain employee morale and confidence, and (d) implement certain administrative procedures that will promote a seamless transition into Chapter 11. This relief is critical to the Debtor's efforts to maximize the value of its assets for the benefit of all stakeholders.

11. This Declaration is submitted in support of the First Day Motions. Except as otherwise indicated herein, the facts and opinions set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtor's employees, or my opinion based upon my extensive experience in the publishing industry.

12. I am authorized to submit this Declaration on the Debtor's behalf. If called upon to testify, I can and will testify competently to the facts set forth in this Declaration.

13. This Declaration provides a summary overview of the Debtor's business operations and the need for its restructuring pursuant to Chapter 11 of the Bankruptcy Code. Section I of this Declaration is a brief history of the Debtor, Section II presents an overview of the Debtor's business operations, Section III discusses the need for Chapter 11 relief and the events leading to the commencement of this bankruptcy case, and Section IV describes the anticipated course of the Chapter 11 Case and a summary of the First Day Motions and the factual bases for the relief requested therein.

### I. THE DEBTOR'S HISTORY

14. Debtor is a children's book publishing company (the "Business"). Debtor was founded by Harriet Ziefert in 2002. Since then, the Debtor has published more than 300 children's book titles

for publishers in the US and abroad.

15. As a publisher, my expertise is in developing books for children from birth to 8 years.

16. As author, I hold book copyrights and have entered into author contracts for titles I have written independently, apart from my roles as President and Publisher of Debtor.

17. After more than 20 years of developing programs for other publishers as the President and Owner of packaging company HZI, I wished to form a publishing company that would reflect my vision. To accomplish this, in 2002, HZI created a division and publishing imprint known as Blue Apple.

18. I grew the Blue Apple division of HZI over a 10-year period into one of the most highly regarded and award-winning, independent children's book publishing companies in the United States.

19. In the summer of 2010, Fernandez and Debtor were tenants in the same building at 515 Valley Street, Maplewood, NJ, occupying offices on different floors. I was introduced to Fernandez by the owner of the building. After I met Fernandez, we mutually discussed and decided Fernandez would attempt to raise equity to grow and expand the Blue Apple book publishing business. Fernandez had a business, Inter-Nation Capital, which raised investment capital for businesses.

20. After various discussions between myself and Fernandez and over a six-month period of due diligence review of the books and records of HZI and the Blue Apple business, assets and liabilities, Fernandez determined to make an investment of $500,000 in Debtor.

21. On or about March 1, 2011, HZI contributed all of the assets and liabilities relating to the Blue Apple division to Debtor. This was done to facilitate the $500,000 investment in Debtor by Pomum Liber, which was owned and controlled by Fernandez and Kellenyi.

22. Pomum Liber had valued Debtor at $4.5 million and decided to invest the $500,000 in the newly formed entity, Blue Apple Books, into which all of the assets and liabilities of the Blue Apple division of HZI were contributed.

23. Pomum Liber originally was going to make a pure equity investment, but ultimately provided its investment in Debtor in the form of a convertible, subordinated debenture with an interest

rate of 6% per annum and five-year maturity. The subordinated debenture was to automatically convert to a 12% membership interest in Debtor unless Pomum Liber elected not to convert it into such membership interest. This conversion feature existed pursuant to a convertible subordinate debenture agreement, which today stands as the limited liability company operating agreement of Debtor.

24. As a condition to Pomum Liber's investment in Debtor, Fernandez required that Debtor change distribution from Chronicle Books to Random House Publisher's Services ("RHPS"). Fernandez inserted himself into many of the day-to-day operations of Debtor, sitting in on meetings with staff, providing advice/opinions about how to run and grow the business, etc.

25. Almost immediately, as a result of this change, RHPS began to lose customers, causing Debtor to lose significant revenue. Fernandez and I attempted to address this with RHPS, but to no avail.

26. As a result of this poor performance by RHPS as distributor, Fernandez caused Pomum Liber to make two additional loans to Debtor in the amounts of [$150,000] and [$165,000], and Kellenyi made a loan to HZI in the amount of [$100,000].

27. The [$100,000] Kellenyi loan was given to and used by HZI and it in fact should have been made in the name of Debtor. I (and thus HZI) was tricked and under duress when I signed this note on behalf of HZI as funds were urgently needed to pay printing bills and other critical operating expenses and the funds were needed on short notice. At some point, the Kellenyi loan was assigned to Pomum Liber.

28. All of these loans were, in my opinion, follow-on loans to the original $500,000 investment in Debtor.

29. HZI and Debtor paid over [$300,000] in interest payments on all of these notes to Pomum Liber.

30. On or about December 13, 2013, due in significant part to threats of litigation by Fernandez towards Jeff Abraham, the head of RHPS, RHPS determined to drop Debtor as distribution

client.

31. Being dropped was a serious problem and Debtor needed to scramble to find an alternative distributor.

32. Debtor entered into a new distribution agreement with Consortium on or about January 6, 2104. Unfortunately, Consortium proved to be even worse than RHPS, and revenues/sales declined further, to the point where Debtor sued Perseus (Consortium's parent company) for breach of contract (failing to perform the services promised under its distribution agreement with Debtor.

33. On or about March 5, 2015, HZI and Debtor also had insufficient revenue to continue to pay interest or principal on the notes made by HZI and Debtor to Pomum Liber or to continue funding the suit against Perseus.

34. On or about November 6, 2015, Blue Apple Books entered into a litigation funding agreement with Pomum Liber.

35. On or about November 8, 2017, Pomum Liber refused to continue funding its share of litigation expenses under the litigation funding agreement, leaving HZI and Debtor with no funds to proceed and forcing them to accept a small settlement from Perseus.

36. Pomum Liber forbore for several years in collecting interest or repayment of all of the notes.

37. On or about July 31, 2020, Pomum Liber sued HZI, Debtor, and Harriet Ziefert for failure to repay the notes, breach of the litigation funding agreement, and fraud. Pomum Liber claimed it was a lender and not an equity investor.

38. This litigation was split between a AAA arbitration and an New Jersey Superior Court case and went on for year and depleted all positive cash flow of both Debtor and HZI. In fact, without the assistance of Fox Rothschild in not insisting on collecting payment currently and myself forbearing from taking over $225,000 in royalty payments I am owed, Debtor and HZI would have had to file for Chapter 11 Bankruptcy long ago.

39. On June 12, 2023, after years of litigation as described above, the $500,000 subordinated debenture made by Debtor in favor of Pomum Liber was converted into a 12% membership interest of Pomum Liber in Debtor by order of Judge Harriet F. Klein, J.S.C. (ret.) as arbitrator pursuant to an arbitration action held before Judge Klein with the American Arbitration Association. Judge Klein determined that Pomum Liber had never elected to not convert the $500,000 subordinated debenture.

40. Judge Klein's order also dismissed various other claims by Pomum Liber and various counter-claims by HZI Debtor.

41. Pomum Liber's claims on the two notes made by Debtor and the one note made by HZI remaining pending before the New Jersey Superior Court and are in dispute by Debtor and HZI.

42. All of the fraud charges were dismissed against Harriet Ziefert by order of Judge Sules in the N.J. Superior Court in case ESX-L-28178-19.

43. The litigation was moved to be before Judge Russo and it has continued over the two remaining notes made by Debtor and the one note made by HZI.

44. Poumum Liber moved for summary judgment in the case on these notes and payments claimed under the litigation funding agreement on or about [October 1, 2024].

45. Judge Russo denied Pomum Liber's motion for summary judgment noting there are triable issues of fact on these notes.

46. This litigation was to go to trial on or about February 18, 2025.

47. Debtor and HZI's largest source of revenue is licensing fees from Epic!, a subscription platform that delivers Debtor's and HZI's content digitally to it customers.

48. Epic! has not paid Debtor or HZI for views during the third and fourth quarters of 2024. This is due to the fact that Epic! had been pillaged by a foreign buyer of Epic! and the creditors of Epic! have forced it into a Chapter 11 Bankruptcy in Delaware in order to gain control of Epic! and pay its vendors, like Debtor and HZI.

49. Epic! is slated to be auctioned off on or about March 15, 2025.

50. At the present time, Epic! owes Debtor approximately $165,000. Epic! also owes HZI approximately $10,000.

51. Debtor and HZI expect to receive all of the amounts owed for prior licensing fees in the third and fourth quarters of 2024 and all licensing fees which are accruing for the first quarter of 2025 and going forward in the future.

## II.  OVERVIEW OF THE DEBTOR'S BUSINESS OPERATIONS

### A. The Debtor's Ownership and Management

52. The Debtor is a privately held New Jersey limited liability company. I, now a resident of Massachusetts, own 88% of the membership interests in the Debtor.

53. Debtor currently operates from two locations: 10 Highland Drive, Great Barrington, MA 01230 and Clock Tower, 75 South Church Street, Pittsfield, MA. The mailing address is PO Box 950, South Orange, NJ 07079.

54. As of the Petition Date, the officers of the Debtor are Harriet Ziefert (President) and Jon Ziefert (Vice President and General Counsel).

55. Each illustrator or author, including myself, receives a contract. Most book contracts provide for royalties to be paid to authors and illustrators; some are "work-for-hire".

56. I am among the group of authors under contract with Debtor. I also hold author contracts with HZI.

57. The current business activities of the Debtor include: (a) calculating royalties to contract holders, (b) monitoring publishers who hold licenses to books, (c) monitoring foreign agents who sell rights to books, (d) renewing licenses, (e) printing books for licensors upon request, (f) increasing content on online platforms such as Epic!, K-12, BOOKR, MyON, (g) supplying metadate to digital reading platforms, (h) monitoring online content, (i) maintaining and updating the Blue Apple Books website, (j) preparing digital catalogs.

### B. The Debtor's Staff

58. As of the Petition Date, the Debtor has no employees. Rather, it operates with Harriet Ziefert and one part-time consultant, Alicia Duran. She is involved in all aspects of the company's day-to-day operations and works as an independent contractor.

59. The Debtor also hires, as needed, freelance professionals for design and production.

### C. Capital and Debt Structure

#### (i). General unsecured creditors

60. Debtor estimates that unsecured claims against the Debtor as of the Petition Date exceed $900,000. Unsecured claims against the Debtor include: (i) accrued and unpaid royalties to authors and illustrators, (ii) accrued and unpaid royalties to Harriet Ziefert, calculated without interest, and (iii) a disputed, unliquidated, and contingent claim via a note (including accrued interest) held by Pomum Liber.

### III. NEED FOR CHAPTER 11 RELIEF AND THE EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

61. Debtor's revenue comes from various revenue streams: (a) publishing books for print in the US and in foreign countries, (b) licensing books for digital subscription platforms, (c) licensing book characters for children's television, (d) custom bulk sales to Big Box Stores/vendors.

62. Debtor is an editorial operation. It does not have a warehouse, it does not have a sales force and it relies on a third-party distribution for selling, warehousing and distributing its books to book sellers. In recent years it licenses its book content to digital subscription services and receives licensing fees for "views" on the digital platforms of these services.

63. Debtor's revenue stream has been severely interrupted due to the delay in payment by Epic! of licensing fees owed to it.

64. Debtor and HZI have been severely affected and damaged by Pomum Liber, Fernandez and the cost of litigation against Pomum Liber.

65. Debtor and HZI have been "running on fumes" for years and the delay in payment by Epic! and litigation costs have resulted in Debtor and HZI needing to be reorganized in Chapter 11.

### D. The Debtor's Consideration of Strategic Alternatives

66. I, Harriet Ziefert, am not considering closing, or selling, the business.

67. I strongly believe that the business can be restored to health for these reasons:

   A) Debtor has as its main source of revenue digital subscription platforms.

   B) The biggest of these platforms is Epic! Creations. (Epic!)

   C) Epic! has not paid Debtor for views in the third and fourth quarters of 2024. At the present time, Epic! owes Debtor approximately $165,000. Epic! also owes HZI approximately $10,000.

   D) Epic! is now in bankruptcy in the Bankruptcy Court in Delaware and the creditors, like Debtor and HZI, are in the process of being paid. Epic! is being auctioned off on or about March 15, 2025 and the administrators handling the Epic! Chapter 11 case are to supposed to announce the purchaser of Epic!'s assets on or about that date. A condition of the sale is that all publishers will be paid for past views and views going forward. The sale of Epic! means that Debtor will have continuing, reliable revenue it can count on.

   E) While Epic! is Debtor and HZI's largest source of revenue, there are other digital platforms and revenue sources and the digital subscription space for children is growing.

   F) Debtor and HZI have excellent catalogs of content that can be licensed and will seek new opportunities as they become available.

### IV. PROPOSED COURSE OF THE CHAPTER 11 CASE

68. To minimize the adverse effects of the commencement of these Chapter 11 Cases on the Debtor's ability to effectuate a timely and efficient Chapter 11 reorganization, the Debtor intends to

pay its post-petition expenses in the ordinary course of business to facilitate its seamless transition into Chapter 11 and to ensure minimum disruption to its operations.

## V. CONCLUSION

69. This Declaration describes the factors that have precipitated the commencement of the Chapter 11 Case.

70. I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: February 25, 2025

By: *HARRIET ZIEFERT*
Harriet Ziefert
President, Blue Apple Books, LLC